

IN THE

# Indiana Supreme Court

Supreme Court Case No. 24S-JC-300

## In the Matter of E.K. (Child in Need of Services); J.S. (Mother),
*Appellant*



FILED
Jun 19 2025, 1:59 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

–v–

## Indiana Department of Child Services,
*Appellee*

Argued: January 16, 2025 | Decided: June 19, 2025

Appeal from the Whitley Circuit Court
No. 92C01-2308-JC-50
The Honorable Matthew J. Rentschler, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 23A-JC-2909

**Opinion by Chief Justice Rush**

Justices Massa, Slaughter, Goff, and Molter concur.

**Rush, Chief Justice.**

The Indiana General Assembly's statutory framework governing children-in-need-of-services (CHINS) proceedings imposes two overarching duties on trial courts: to exercise independent discretion in assessing a child's best interests and to safeguard parties' rights by ensuring due process and entering CHINS adjudications only when all statutory elements are met. By fulfilling these duties of independent judgment and adherence to the law, courts can balance the State's interest in protecting vulnerable children with a parent's right to raise their children.

Here, an adoptive mother declined to take back into her home a teenage son with a long history of violence toward her and his siblings. The Department of Child Services (DCS) sought a CHINS 1 adjudication on the basis that the mother failed to supply the child with necessary shelter. At the fact-finding hearing, the mother asked the court to enter one of two alternative CHINS adjudications: a CHINS 6 based on the child endangering himself or others; or a CHINS 10 based on his fetal alcohol syndrome diagnosis. The court deferred to DCS's filing decision in denying the mother's request and entered a CHINS 1 adjudication.

We vacate and remand. In reaching this disposition, we first provide a statutory roadmap of CHINS proceedings—from investigation through fact-finding—for the benefit of not only these parties but also our trial courts, DCS, practitioners, and families. Then, in applying that roadmap, we hold that DCS failed to present evidence showing the mother either had the financial means to provide her son with a safe home or failed to seek other reasonable means to do so—a requisite element of CHINS 1. We also hold that the trial court should have independently assessed whether the child's best interests called for a CHINS 6 or 10 adjudication. But because significant procedural shortcomings make it inappropriate on this record to adjudicate the child under either category, we remand for further proceedings consistent with this opinion.

# Facts and Procedural History

This case turns on whether an adoptive mother sought all reasonable means to keep her teenage son safe after his persistent violent outbursts led her to decline to take him back from out-of-home placements. As such, it is important to lay out a detailed history of the son's violence and the mother's consistent efforts to seek help.

E.K. is the adopted son of J.S. (Mother) and A.K. (Father). He was exposed to drugs and alcohol in the womb and was born in 2008 with fetal alcohol syndrome. He has since been diagnosed with ADHD, autism, and disruptive mood dysregulation disorder. When E.K. was two years old, Mother and Father fostered him and, after six months, adopted him. Mother and Father subsequently divorced in 2020, and Mother had custody of their children. Before the proceedings at issue here, Mother worked as a classroom special needs assistant in Allen County where she gained experience and training in managing and modifying children's difficult behaviors. And at the time of these proceedings, E.K. was fifteen years old and had an older sister, two younger brothers, and a younger sister living in Mother's home. He also had two younger stepsiblings living in Father's home.

From an early age, E.K. struggled with controlling his anger and aggression. At age four, he threw a block at his baby brother's head, causing a wound that needed stitches. By age nine, his behavior escalated to flipping over his bed and trying to break a second-story window, leading to a stay at Parkview Behavioral Health Institute. E.K.'s behavior then stabilized for a few years while he received "all kinds of outpatient therapies." But by 2021, when E.K. was twelve years old, he realized he could hurt Mother, and that became his "go-to defense" to "get what he wanted."

One of E.K.'s first "over-the-top attacks" occurred in July 2021 when Mother told him not to wear his necklace while swimming, which angered him. Mother and R.S. (Stepfather) got E.K. up to his bedroom—his "safe area"—but he shattered the window and then kicked Mother, who was six months pregnant at the time, in the stomach. Because Mother and

Stepfather could not fully restrain him, they had E.K.'s older sister call the police. The police came, and, after calming E.K., took him to Parkview. Meanwhile, Mother had to go to the hospital because the trauma sent her into labor. This event "was kind of the start of everything."

Over the next eighteen months, E.K. exhibited a series of outbursts that required police involvement, including ten documented incidents of violence. For example, in February 2022, he unscrewed a rod from his closet and pounded on his bedroom door with it. The police came but would not "even go into the room because he had a weapon." The following month, E.K. picked up a chair and threw it at Mother. In April, he "kicked a humungous hole in the wall," threw drywall at a police officer, and punched a female representative who had come to provide post-adoption services. The police were called three times in May, including on one occasion after E.K. threw a fifteen-pound tub of cat food at Mother and beat her with a baby gate, spraining her thumb. In August and again in October, he became "very violent" and hit Mother.

On several of these occasions, officers detained E.K. and took him back to Parkview. Yet E.K. returned home each time, resulting in Mother and Stepfather containing him during his violent outbursts while his older sister gathered the other children and led them to safety. E.K.'s siblings have also suffered from his aggression as Mother has had to step between E.K. and her other children "several times" due to E.K. attacking them. He has thrown things within an inch of his youngest brother's head. And he has attempted to punch his younger sister, who uses hearing aids, after becoming frustrated with her occasional difficulty in hearing. Another time, E.K. took the same sister's hand, punched her in the face with it, and then attacked Mother when she told him to apologize. Additionally, as E.K. started to experience puberty, he began to misbehave sexually, touching his sisters' buttocks and trying to insert a toy into his next-youngest brother's rectum. While receiving respite-care services, too, E.K. made inappropriate sexual noises and pushed a child to the ground, which resulted in him not being allowed to return to the facility. He also endangered himself by running away from home in a blizzard without a coat, hat, gloves, or shoes, and had to be rescued by a passerby. And he

even grabbed the steering wheel of Stepfather's van and tried to steer it off the road while his youngest brother was in the backseat.

Throughout this time, Mother tried a vast array of techniques to de-escalate E.K. and continuously sought services to both help him and protect her other children. She placed him at the Indiana ABA Institute where he worked with a behavioral analyst for four years. She ensured he received post-adoption services through Specialized Alternatives for Families and Youth and wraparound services from Crossroad Family and Child Services. Mother and E.K. worked with a psychiatrist at the Center for Neurobehavior Services. Mother tried "all kinds of behavior modification programs," each of which worked at first but in time became a trigger for E.K.'s anger. And she even involved DCS by having representatives come into her home "on several occasions" for family evaluations. At the first evaluation, DCS told Mother that E.K. was "not in enough services," so she added more. Mother also received funding and sought a residential placement for E.K., but she could not find one that would accept him because "he was too violent." DCS even suggested Mother "seek shelter outside of the home and live separately with" E.K., but Mother could not afford two households.

The continuing deterioration of E.K.'s self-control led to his parents meeting with DCS and E.K.'s service providers in December 2022, after which E.K. moved to live with Father in Whitley County. But that move resulted in the loss of E.K.'s services in Allen County, including funding for residential placement. On weekends, E.K. would visit Mother while, for safety reasons, his siblings stayed with Father. During one of those visits, E.K.'s refusal to go to bed escalated into him ripping a light fixture off the garage and slicing his finger in the process. He then tried to smash a window out of Mother's van as she drove him back to Father's home. After about four months living with Father, E.K. started to scream at him and become violent toward his stepsiblings. This behavior followed E.K.'s pattern of enjoying a "honeymoon period" in a new setting before his aggression would escalate. Indeed, in June 2023, E.K. "spiraled out of control" when Father disciplined him. He ripped a door off its hinges, put holes in the wall, flipped his bed, tore a television off its mount, and scratched at Father's eyes. After police were called, E.K. was taken to the

emergency room and then temporarily admitted to Harsha Behavioral Center on June 18.

Harsha devised a treatment plan to improve E.K.'s impulse control. But he continued to exhibit aggression at the facility—he threw chairs, flipped a table, attacked and spat at staff members, tried to headbutt a nurse, and punched walls. Staff twice placed him in a restraint chair when attempts at redirecting his disruptive and violent behavior failed. Yet on June 29, four days after E.K. had last attacked staff, Harsha declared him fit for discharge.

During this time, Mother and Father met and spoke with DCS several times, consistently telling them that E.K. needed residential care and more help than he had access to. DCS developed a plan for wraparound or intensive in-home services to keep E.K. in Father's home. DCS also explained that the family needed to participate in ninety days of wraparound services before E.K. could reapply for residential care funding. But Father insisted E.K. could not return to his home without a "live in nanny" because of the risk to his wife and his stepchildren. Nor should E.K. go back to Mother's home, Father said, because of the risk to Mother and the other children. Mother added that taking E.K. back would require "many safeguards in place" and that E.K. could never be alone with Stepfather because he could not handle E.K.'s behavior. Mother also informed DCS that she had surgery scheduled for July 17 and would not be able to supervise E.K. for eight weeks afterward. During a meeting on June 29, the day Harsha approved E.K. for discharge, Mother told DCS she could not ensure E.K.'s "safety or the safety for the other children in the home" unless E.K. were kept in a separate room by himself. Both parents reported that they could pick E.K. up from Harsha but stated he wouldn't have a safe place in either of their homes. Harsha held E.K. until DCS could find an appropriate placement.

Yet on July 3, DCS filed a petition alleging E.K. was a CHINS under Indiana Code section 31-34-1-1 ("CHINS 1"), which concerns a parent's "inability, refusal, or neglect" to provide necessities such as "shelter." DCS alleged neither Mother nor Father was willing and able to take E.K. home "despite additional services being offered to assist" them. The trial

court awarded DCS emergency custody of E.K., and he remained at Harsha for two more weeks. Though E.K. did not attack anybody during this period, he often needed redirection and displayed poor boundaries with peers. Harsha again declared him fit for discharge on July 17—the same day as Mother's surgery.

The next day, two DCS caseworkers picked E.K. up from Harsha and placed him with licensed foster parents in a home with another foster child who had attended the ABA Institute with E.K. No serious issues were reported between E.K. and his new foster brother, who, according to Mother, was E.K.'s friend, "bigger," and "able to defend himself." And while E.K.'s foster mother found that his eruptions of anger calmed down after a month and a half with her, he still experienced outbursts and damaged her property. E.K. was also engaging in self-harming behaviors at school, such as banging his head on lockers and ramming himself into desks. During this time, DCS arranged for supervised parenting time out of concern for the safety of Mother and her children and in case E.K. had a "meltdown." Mother continued to tell DCS she would not feel safe with E.K. in her home and conveyed that he needed to be in a group home or residential care. E.K.'s older sister expressed similar concerns, telling the caseworker she would not feel safe around E.K. without "a 24/7 body guard." The caseworker explained that residential care was not a permanent solution and that the parents' safety was not DCS's concern.

On August 14, DCS asked Mother and Father to take E.K. back and moved the trial court to dismiss the previously filed CHINS case. Mother objected and asked the court to adjudicate E.K. a CHINS either because he endangered his own or another individual's health under Section 31-34-1-6 ("CHINS 6") or because he had been born with fetal alcohol syndrome under Section 31-34-1-10 ("CHINS 10"). The court dismissed the case over Mother's objection. DCS then told Mother and Father to pick E.K. up from his foster home. Mother responded that she could not do so because she was "still recovering from her surgery," and she told DCS to contact Father because he "was the custodial parent." Father also declined, telling DCS that his wife would leave him if E.K. returned and that E.K. would not have a caregiver during work hours.

Following Mother's and Father's failure to pick E.K. up from his foster-care placement, DCS filed a second petition under CHINS 1, alleging E.K. was maintaining "acceptable behavior" and proving amenable to redirection. DCS also substantiated an allegation of neglect by Mother, resulting in the loss of her job. The chronological case summary (CCS) reflects that the court clerk issued summonses for Mother and Father, but not for E.K. At the detention hearing, the court again ordered DCS to take custody, and E.K. remained in the foster home. The court then held an initial hearing for Father and Mother but excluded E.K. from the hearing "for good cause" without further explanation. Father later admitted E.K. was a CHINS 1 and, on that basis, the court adjudicated E.K. as such and issued a dispositional decree for Father. Mother, however, proceeded to a contested fact-finding hearing on October 30 at which Mother, E.K.'s foster mother, and the DCS family case manager (FCM) testified. E.K.'s court appointed special advocate (CASA) also attended, but she did not testify. E.K. was absent, however, although the record does not indicate he was excluded from this hearing for good cause.

At the fact-finding hearing, Mother testified there was no "safe place" she and Father could find for E.K. While she did not want E.K. "to be gone," she did not know how to "keep him safe" or ensure he would not hurt her and her "defenseless" young children if he came back into the home. Mother also introduced documents for the limited purpose of proving E.K.'s contacts with various services. These documents contained three recommendations—from E.K.'s behavioral analyst, his psychiatrist, and a Harsha psychiatrist—that he needed to be placed in a residential facility. The FCM, however, testified that Mother could provide a safe home for E.K.—although he admitted he had been assigned to E.K.'s case only in July 2023, had never witnessed him being dangerous, and was not a specialist in "placing children" in foster care. He also acknowledged that the services DCS had arranged were not new to the family.

At the end of the hearing, DCS insisted E.K. was a CHINS 1 because Mother failed to take him back into her home. DCS focused on E.K.'s "current state" and argued his "destructive behavior" had "subsided quite a bit." But Mother asked the court, under Indiana Trial Rule 15(B), to amend DCS's petition "to conform to the evidence presented" by alleging

E.K. satisfied either CHINS 6 or 10. In Mother's view, CHINS 1 was a "catch-all" statute that "may" cover E.K., but CHINS 6 or 10 "more specifically and more accurately describe[d] the situation." On this point, DCS conceded the court had authority to enter a CHINS 6 adjudication if it found E.K. met the standard but insisted the evidence did not show E.K. would "substantially endanger himself or others." DCS also told the judge that such an adjudication would be akin to a juvenile delinquency finding and subject E.K. to placement on the child protection index as a "perpetrator" of "child abuse or neglect." *See* Ind. Code §§ 31-9-2-14(a)(1), 31-33-26-2, 31-33-26-11(a).

After the hearing, the trial court issued a written order that included findings of fact and conclusions of law. In that order, the court adjudicated E.K. under CHINS 1 because Mother "refused" to provide him with "necessary shelter." The court also concluded that "the facts of this case satisfy both" the CHINS 6 and 10 "statutes." But it declined to adjudicate E.K. under either because of the "potential negative impacts" on him and concerns that separation-of-powers principles might preclude the court from interfering with DCS's decision to file the case under CHINS 1. In the court's view, its only role was to call "balls and strikes," and DCS had thrown a strike.

Mother appealed, arguing that there was insufficient evidence to support the CHINS 1 adjudication and that the trial court erred in denying her request to amend DCS's petition and adjudicate E.K. as either a CHINS 6 or 10. The Court of Appeals affirmed in a memorandum decision. *In re E.K.*, No. 23A-JC-2909, at *8 (Ind. Ct. App. May 6, 2024) (mem.). The panel held that the trial court properly declined CHINS 6 and 10 adjudications because of the negative consequences for E.K. *Id.* at *5–6. And it found CHINS 1 applied because, after "the State and the juvenile court determined that [E.K.] was ready to be returned" to his parents, neither Mother nor Father "accepted this responsibility." *Id.* at *8.

Mother petitioned for transfer, which we granted, thus vacating the Court of Appeals' opinion. Ind. Appellate Rule 58(A).

## Standard of Review

In reviewing a CHINS adjudication, we neither reweigh the evidence nor judge the credibility of witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). When, as here, the court supplements its order with findings and conclusions sua sponte, we consider whether the evidence supports the findings and whether those findings support the judgment. *Id.* at 1287. But we review issues not covered by the findings under the general judgment standard, meaning we will affirm the court's decision if it can be sustained on any legal theory supported by the evidence. *Id.*

## Discussion and Decision

Indiana's juvenile law is founded on the *parens patriae* power of the State and the courts to "step into the shoes" of parents, guardians, or custodians when necessary to safeguard a child's best interests. *In re K.G.*, 808 N.E.2d 631, 635–36 (Ind. 2004). CHINS law in particular is focused on serving "families in crisis" by getting children the help that parents are not "willing or able to provide." *S.D.*, 2 N.E.3d at 1285. Thus, in CHINS proceedings, the courts' focus is on protecting children, not punishing parents. *Id.* Indeed, the courts and DCS must make "all decisions . . . in consideration of the best interests of the child or children concerned," I.C. § 31-10-2-2(2), with ensuring a child's safety "the most important consideration," I.C. § 31-10-2-1.5.[1]

To advance a child's best interests during CHINS proceedings, our trial courts are vested with "broad discretion." *K.G.*, 808 N.E.2d at 636. But this discretion is not unbounded. Courts must uphold the parties' "due process rights" and "take into account recommendations and input" from DCS, parents, children, and others. *In re K.D.*, 962 N.E.2d 1249, 1255 (Ind. 2012). And to guard against "unwarranted State interference in family life," courts can only adjudicate a child as needing services when all the

---

[1] The latter statute was enacted after the fact-finding hearing in this case. Pub. L. No. 70-2024, § 2, 2024 Ind. Acts 1134, 1134.

substantive requirements of the applicable CHINS statute are satisfied. *See S.D.*, 2 N.E.3d at 1287. In this way, the State's "'coercive intervention' into family life"—and the potentially long-lasting collateral consequences of a CHINS adjudication—are reserved for families that cannot meet their children's needs "without coercion." *Id.* at 1285. In sum, CHINS law imposes on courts two overarching duties: to independently assess a child's best interests and to adhere scrupulously to procedural and substantive requirements. Resolving this appeal requires us to uphold both those duties.

Mother challenges E.K.'s CHINS 1 adjudication, contending that DCS failed to prove she refused to supply E.K. with necessary shelter because she persistently sought services for him and decided not to take him home only because doing so would have endangered E.K., her other children, herself, and Stepfather. And she contends the trial court improperly deferred to DCS's decision to seek only a CHINS 1 adjudication when considering her request to instead enter adjudications under CHINS 6 or 10. DCS responds that the evidence supports the CHINS 1 adjudication because Mother would not provide a home for E.K. and that the trial court appropriately decided not to "insert its own opinions about how DCS chose to file its CHINS petition."

We agree with Mother. The trial court could only adjudicate E.K. under CHINS 1 if Mother failed to supply him with "necessary . . . shelter" when she was "financially able to do so" or due to her "failure, refusal, or inability . . . to seek financial or other reasonable means to do so." I.C. 31-34-1-1(1). Viewed in light of the trial court's well-supported finding that E.K. posed a danger to himself or others, the record is devoid of evidence that Mother could have done more—financially or otherwise—to provide E.K. with the safe, secure, and stable shelter he needed. Indeed, the record is replete with evidence that E.K. would not have been safe in Mother's home with only the resources and services DCS made available. As for the alternative CHINS 6 and 10 categories Mother put forward, the trial court was statutorily required to consider whether entering such adjudications would advance E.K.'s best interests, rather than deferring to DCS. But based on significant procedural omissions, we will not order such adjudications at this stage. We instead remand the case with instructions

for the trial court to conduct further proceedings consistent with this opinion.

Before analyzing the precise issues presented here, we begin by taking this vital opportunity to set out a roadmap for safeguarding the rights of parties and the best interests of children in CHINS proceedings.

## I. Statutes governing CHINS proceedings provide procedural and substantive rights to parents and children and give trial courts independent discretion to advance children's best interests.

In 2024, there were nearly 19,000 active CHINS cases across our state, which represented a 13% increase from 2023. Strikingly, 2024 saw a 28% increase in new CHINS filings. While we have occasionally resolved appeals challenging CHINS judgments, we have not systematically laid out the statutory framework governing these proceedings. And this framework is complicated, as shown by the parties' contrary positions at various stages, the trial court's order, and the need for clarification reflected in the briefing. Though confusion has abounded here and, anecdotally, in other CHINS cases, our Legislature has codified a state policy to "provide a judicial procedure" that "ensures fair hearings" and "recognizes and enforces the legal rights of children and their parents." I.C. § 31-10-2-1(11).

Consistent with that policy, we take this opportunity to provide a statutory roadmap of CHINS proceedings—from investigation through fact-finding—for the benefit of our trial courts, DCS, practitioners, and families. In doing so, we expand on a trial court's two overarching duties: to exercise its independent discretion when assessing a child's best interests and to safeguard the parties' procedural and substantive rights. And in detailing those duties, we identify three principal guideposts relating to DCS's burden of proof, the procedural rights of parents and children, and a trial court's responsibility to consider amending a CHINS petition in a child's best interests.

We begin at the point DCS becomes aware that a child "may be a victim of child abuse or neglect." I.C. § 31-33-7-4(a). Within forty-eight hours, DCS must produce a written report containing specified information. I.C. § 31-33-7-4(a), (c). And it must also "initiate an appropriately thorough child protection assessment." I.C. § 31-33-8-1(a). Upon completion of that assessment, DCS classifies each report as "substantiated or unsubstantiated," I.C. § 31-33-8-12, which depends on whether the "facts obtained . . . provide a preponderance of evidence that child abuse or neglect has occurred," I.C. § 31-9-2-123. DCS then enters "data regarding substantiated reports of child abuse and neglect" into the child protection index (CPI), I.C. § 31-33-26-2, which triggers a requirement to notify the child's parents and any other identified "perpetrator," I.C. § 31-33-26-8(b). Additionally, when an intake officer "has reason to believe that the child is a child in need of services," they must make a "preliminary inquiry" and recommend whether DCS should seek permission to file a CHINS petition or pursue an informal adjustment, among other options. I.C. §§ 31-9-2-62, 31-34-7-1, 31-34-7-2; *see also infra*, at 18 (explaining the difference between CHINS status and "child abuse or neglect"). Throughout this investigation process, any person accused of committing child abuse or neglect is entitled to access "a report relevant to an alleged accusation." I.C. § 31-34-7-4.

Before seeking authorization to file a CHINS petition, DCS has other options to assist families. It can "refer the parent or guardian to a community service program that provides respite care, voluntary guardianship, or other support services for families in crisis as appropriate to meet the needs of the family." I.C. § 31-33-8-15(c). And it may "enter into a voluntary service referral agreement with the child's parent," under which the parent must "successfully participate in and complete any family or rehabilitative services recommended by" DCS. I.C. § 31-33-8-16. An intake officer may also, with the trial court's approval, implement a "program of informal adjustment." I.C. § 31-34-8-1(a). But if DCS "determines that the best interests of the child" require a juvenile court's intervention, it must "refer the case" to the court under Chapter 31-34-7. I.C. § 31-33-14-1(1).

Under that chapter, either DCS or a prosecutor can ask the trial court to authorize the filing of a CHINS petition. I.C. §§ 31-34-7-3, 31-34-9-1(a)–(b). The court must approve the filing if it "finds probable cause to believe that the child is a child in need of services." I.C. § 31-34-9-2(2). The petition must be verified and provide enumerated information, including a citation to the relevant statute defining "a child in need of services." I.C. § 31-34-9-3(1), (4)(B). A misleading error in, or omission of, a citation subjects the petition to dismissal. I.C. § 31-34-9-4.

Our Legislature has defined a CHINS in twelve statutes, which are commonly referred to as categories. I.C. §§ 31-34-1-1 to -11.[2] Each category applies to different circumstances, but all of them require the child to need care, treatment, or rehabilitation they are not receiving and that is unlikely to be provided or accepted without the court's coercive intervention. *Id.* Three categories are relevant here. CHINS 1—commonly known as the "neglect" category and the one DCS invokes most often—applies to a child whose "physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect" of the child's parent "to supply the child with necessary food, clothing, shelter, medical care, education, or supervision." I.C. § 31-34-1-1(1). But since 2019, CHINS 1 applies only if the parent failed to supply the child's necessities when the parent was "financially able to do so" or due to their "failure, refusal, or inability . . . to seek financial or other reasonable means to do so." Pub. L. No. 198-2019, § 8, 2019 Ind. Acts 2355, 2361 (codified at I.C. § 31-34-1-1(1)(A)–(B)).[3] CHINS 6—which is not based on a child being the victim of abuse or neglect—concerns a child who

---

[2] Though there are twelve statutes, there are only eleven CHINS categories. Section 31-34-1-9 does not create a separate category but, rather, includes a child with disabilities who is a CHINS under one of eight other categories. *See* I.C. § 31-34-1-9.

[3] In the same session, the Legislature enacted a provision stating a court "may find" CHINS 1 inapplicable when a parent shows they are financially unable to supply a child's food, clothing, or shelter, and they have not failed, refused, or demonstrated inability to seek means to do so. Pub. L. No. 210-2019, § 8, 2019 Ind. Acts 2457, 2462 (codified at I.C. § 31-34-12-8). By its plain terms, however, CHINS 1 does not apply when a child's parent is financially unable to provide for the child's needs and seeks other reasonable means to do so.

"substantially endangers the child's own health or the health of another individual." I.C. §§ 31-34-1-6(1), 31-9-2-14(a)(1), 31-9-2-133(a)(1). And CHINS 10 concerns a child who is "born with . . . fetal alcohol syndrome," "neonatal abstinence syndrome," or with certain drugs or metabolites in their body. I.C. § 31-34-1-10(1). Because a child described in CHINS 10 is deemed to be a victim of child abuse or neglect, I.C. § 31-9-2-133(a)(1)(B), the perpetrator of such conduct will often be the child's birthmother.

After authorizing DCS to file a CHINS petition, the court must appoint a guardian ad litem (GAL), CASA, or both to represent and protect the child's best interests. I.C. §§ 31-32-3-6, 31-34-10-3. The court may also appoint counsel to represent the child. I.C. § 31-32-4-2(b); *see also* Katherine Meger Kelsey, *A Child's Right to Counsel: The Case for Indiana to Craft Its Own Framework*, 9 Ind. J.L. & Soc. Equal. 167, 196–97 (2021) (providing a list of factors for trial courts to consider in deciding whether to appoint counsel for a child). From filing onward, each party to the proceedings—including the child, their parents, DCS, and the GAL or CASA—has "all rights of parties under the Indiana Rules of Trial Procedure." I.C. § 31-34-9-7. Those rights include the ability to file pleadings, receive service, obtain and present evidence, seek relief from the court, and otherwise use compulsory process. *See* Ind. Trial Rules 3, 4, 5, 26, 43.[4]

Sometimes, a CHINS petition is filed either before or at the time a child is removed from their home due to alleged abuse or neglect. When this happens, DCS must promptly notify the child's parents and provide them with a person or entity to contact for more information. I.C. §§ 31-34-3-1 to -4. DCS must also submit written information to the child's parents regarding their legal rights, including the rights to be represented by an attorney, cross-examine witnesses, and present evidence on their behalf at each proceeding. I.C. § 31-34-4-6(a). DCS must provide this information when the child is removed or when the petition is filed, whichever occurs

---

[4] Effective July 1, 2025, Section 31-34-9-7 expressly includes "rights of discovery, subpoena, examination of witnesses, and presentation of evidence at any hearing, including a fact finding hearing." Pub. L. No. 179-2025, § 13.

first. I.C. § 31-34-4-6(b). A combined detention and initial hearing must then be held within forty-eight hours. I.C. §§ 31-34-5-1, 31-34-10-2(j). And notice must be given to the child, their parents, and any foster parent or caretaker with whom the child has been placed. I.C. § 31-34-5-1(a). After the hearing, the court can either release the child to their parent or order the child placed elsewhere if it makes specified written factual findings. I.C. § 31-34-5-3.

When a detention hearing is not required, the court must set a time for an initial hearing and issue summonses for the child, parents, appointed GAL or CASA, and any "other person necessary for the proceedings." I.C. § 31-34-10-2(b). The summons must include a copy of the petition. I.C. § 31-34-10-2(c). And the initial hearing must take place within ten days. I.C. § 31-34-10-2(a).

At the initial hearing, the court must inform the child—if they are "at an age of understanding"—and the parents of the nature of the allegations and the dispositional alternatives that might follow a CHINS adjudication. I.C. § 31-34-10-4; *see also* I.C. § 31-34-10-5 (identifying other information that must be given to parents). The court must also determine whether the proper party or parties admit or deny the allegations. For petitions alleging the child is a CHINS 3.5 or 6, the child is the respondent who must either admit or deny. I.C. § 31-34-10-7. For petitions alleging any other category, the parents must admit or deny. I.C. § 31-34-10-6. When a child has two parents and one admits to the allegations but the other denies them, adjudication does not immediately follow. *K.D.*, 962 N.E.2d at 1255–57. Rather, DCS's allegations may require separate analysis of the facts concerning each parent's conduct. *Id.* at 1256. And either parent can challenge whether the court's coercive intervention is necessary. *Id.* at 1257. Thus, even when only one parent denies the child is a CHINS, DCS must still prove its case. *Id.* at 1259–60.

If the proper parties admit the allegations, the court may immediately hold a dispositional hearing. I.C. § 31-34-10-9(a). But if the allegations are denied, the court must hold a fact-finding hearing. I.C. §§ 31-34-10-9(b), 31-34-11-1(a). That hearing can occur immediately after the initial hearing, but only if all listed persons consent, including the "child if competent to

do so." I.C. § 31-34-10-9(b)–(c). Absent such consent, the fact-finding hearing must be held within sixty days of the petition's filing unless all parties consent to extending the deadline by another sixty days. I.C. § 31-34-11-1(a)–(b).[5] Aside from ensuring the parties receive notice of a scheduled fact-finding hearing, DCS must also notify "each foster parent or other caretaker with whom the child has been placed for temporary care." I.C. § 31-34-11-1(c).

At the fact-finding hearing, the parents and the child have the right to introduce evidence, obtain evidence and witnesses by compulsory process, and cross-examine witnesses. I.C. §§ 31-32-2-1, 31-32-2-3(b). As for the child, any waiver of these rights must comply with the heightened requirements of the juvenile waiver statute. *See* I.C. § 31-32-5-1. But even absent waiver, a court can limit the child's rights by excluding them "from any part of any hearing for good cause shown upon the record." I.C. §§ 31-32-2-1, 31-32-6-8(2).

During the fact-finding hearing, DCS must prove each element of the alleged CHINS category by a preponderance of the evidence. I.C. § 31-34-12-3. But even when DCS alleges a child is a CHINS under one category, the evidence presented at the hearing may show the child's circumstances fit a different category. In such cases, a party can ask the court to adjudicate the child under that other category. Indeed, Trial Rule 15(B) allows parties to try issues not raised in the pleadings by "express or implied consent." T.R. 15(B). And even when a nonmoving party objects, the court may still amend the pleadings to conform to the evidence "and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would" cause prejudice. *Id.* Thus, the trial court is not bound by DCS's filing decision when asked to amend a CHINS petition. Rather, our Legislature has directed courts to

---

[5] Effective July 1, 2025, a new code section provides that most other CHINS deadlines are not waivable. Pub. L. No. 179-2025, § 7 (to be codified at I.C. § 31-32-1-5).

independently consider—in this decision as in "all decisions"—the best interests of the child. I.C. § 31-10-2-2(2).

That said, amending certain CHINS categories under Trial Rule 15(B) at fact-finding becomes complicated when the child is excluded from the hearing or unrepresented by counsel. Such a child can neither meaningfully consent to nor object to trying issues outside the pleadings. In these circumstances, the court should consider whether the requested amendment will promote "the presentation of the merits of the action." T.R. 15(B). Naturally, fuller presentation of the merits will generally advance the child's best interests. But the trial court must also identify whether the amendment implicates CHINS 3.5 or 6—the categories requiring the child to admit or deny the allegations. If so, the court should ensure, when appropriate, that the child receives this opportunity and that the amendment does not prejudice their defense under these categories. The court should also determine, based on any new allegations, whether the child's participation in the hearing and the appointment of counsel are appropriate. And when facing CHINS 3.5 or 6 allegations, a child will need the assistance of counsel to meaningfully respond. *See* Kelsey, *supra*, at 181 (noting that "a child is even more ill-equipped than an adult party to exercise the rights granted to them as a self-represented litigant"). Thus, the best practice is for the court and counsel on all sides to determine at the earliest opportunity whether any party might request adjudication under an alternative CHINS category. All parties can then receive proper notice. *See In re M.O.*, 72 N.E.3d 527, 532 (Ind. Ct. App. 2017) (finding parties were put on notice when parents filed a notice of intent to seek a CHINS 6 adjudication).

If, after the fact-finding hearing, the trial court finds that DCS has met its burden, the court must, among other tasks, enter judgment and schedule a dispositional hearing. I.C. § 31-34-11-2. And if the court's CHINS finding is based on a substantiated report of "child abuse or neglect," DCS must add identifiable information about the judgment to the CPI. I.C. § 31-33-8-13. For purposes of the CPI, only CHINS categories 1 through 5 and 8 through 11 implicate "child abuse or neglect." I.C. §§ 31-9-2-14(a)(1), 31-33-26-2. And childcare providers, among others, can access the CPI with respect to current and prospective employees and volunteers

who give their consent. I.C. § 31-33-26-16(a)(2)(A)–(B). Thus, a court's decision to adjudicate a child a CHINS under one category rather than another can carry serious collateral consequences.

In concluding our statutory roadmap of CHINS proceedings from investigation through fact-finding, we identify three guideposts: (1) DCS must prove every substantive element of a CHINS category to obtain an adjudication, including the CHINS 1 requirement that a child's parents either have the means to supply the child's necessities or fail to seek them; (2) DCS and courts must afford to parents and children all the notice and opportunities to be heard to which they are entitled by statute or trial rule; and (3) courts can amend petitions on a party's request to include CHINS allegations not pled by DCS when doing so serves the child's best interests and does not prejudice the child's rights. With the statutory roadmap and these guideposts in mind, we now address the issues raised in this appeal.

## II. The trial court erred in adjudicating E.K. under CHINS 1 based on insufficient evidence and misinterpreted the law when considering whether to adjudicate him under CHINS 6 or 10.

Recall that Mother advances two arguments in this appeal: the evidence was insufficient for the trial court to adjudicate E.K. a CHINS 1; and the court incorrectly believed it was compelled to defer to DCS when deciding whether to amend the CHINS petition and adjudicate E.K. under CHINS 6 or 10. We agree with Mother on both issues.

We first explain that CHINS 1 requires a parent to provide a child with necessary shelter—that is, safe, secure, and stable housing. And here, given the danger E.K. posed to himself and others, the record contains no evidence that Mother either had the financial means or failed to seek other reasonable means to provide him with such shelter. Rather, all the evidence establishes that Mother did all she reasonably could to keep E.K. safe. We then explain that the trial court should have independently assessed whether adjudicating E.K. under CHINS 6 or 10 would advance

his best interests, rather than deferring to DCS's decision to allege only CHINS 1.

## A. There was insufficient evidence that Mother either had or failed to seek the means to supply E.K. with necessary shelter as required under CHINS 1.

As our roadmap's first guidepost requires, DCS must prove every substantive element of a CHINS category to obtain an adjudication. For the CHINS 1 category, the statute explains:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
> > (A) when the parent, guardian, or custodian is financially able to do so; or
> >
> > (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

I.C. § 31-34-1-1. E.K. is under the age of eighteen, and all parties agree he needs care, treatment, or rehabilitation that he is not receiving and that is

unlikely to be provided or accepted without court intervention. So, our focus is on the statute's remaining element under Subsection (1).

To satisfy that element, DCS needed to establish E.K.'s "physical or mental condition" was "seriously impaired or seriously endangered as a result of" Mother's "inability, refusal, or neglect" to supply E.K. with "necessary . . . shelter." *Id.* But DCS also had to establish that Mother was either "financially able" to supply E.K. with necessary shelter or that she failed, refused, or was unable "to seek financial or other reasonable means to do so." I.C. § 31-34-1-1(1)(A)–(B). As DCS appropriately conceded at oral argument, it failed to prove Mother was financially able to supply E.K. with necessary shelter. Thus, we must determine whether DCS established Mother was unable, refused, or neglected to provide E.K. with such shelter due to her "failure, refusal, or inability . . . to seek financial or other reasonable means to do so." I.C. § 31-34-1-1(1)(B).

We begin with what constitutes "necessary . . . shelter." I.C. § 31-34-1-1(1). Because the Legislature has not defined either term, we take them in "their plain, or ordinary and usual, sense." I.C. § 1-1-4-1(1). In this context, "necessary" means "absolutely needed," *Necessary*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/necessary (last visited June 19, 2025), and "shelter" means "something that covers or affords protection" or "a position or the state of being covered and protected (as from bad weather or danger)," *Shelter*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/shelter (last visited June 19, 2025). From these definitions, we conclude that CHINS 1 requires parents to provide children with the protection they need. And such protection includes not merely housing but a safe, stable, and secure dwelling. *See In re M.P.*, 162 N.E.3d 585, 592 (Ind. Ct. App. 2021) (concluding DCS failed to prove a parent's home was not a "safe and stable living environment"); *In re A.B.*, 245 N.E.3d 644, 651 (Ind. Ct. App. 2024) (concluding domestic violence rendered the children's home unsafe).

The trial court entered no findings or conclusions on Mother's failure, refusal, or inability to seek financial or other reasonable means to provide E.K. with a safe, stable, and secure home. But the court made related

findings on the risks E.K. would pose if he were returned to Mother's home. Indeed, the court concluded the elements of CHINS 6 were satisfied, meaning the evidence established E.K. substantially endangered his own health or that of another. To that point, the court found E.K. "can be aggressive and violent," "sometimes destroys property or injures himself or others," "sometimes engages in inappropriate sexual behavior," "has insufficient impulse control," and has repeatedly required police intervention to de-escalate outbursts. The court also found Mother may have done "what was best for her family as she has other children and her own safety to consider."

These findings are amply supported by evidence from the fact-finding hearing. That evidence includes E.K.'s history of violently attacking Mother and endangering his siblings, repeatedly risking his own health by breaking windows, doors, and light fixtures, running away in a blizzard, and trying to steer a van off the road. And the police have responded to keep E.K. and his family safe time and again. Even around the time of the fact-finding hearing, E.K. had been engaging in unsafe behaviors, such as ramming his head into lockers and desks at school. DCS recognized the danger E.K. posed by arranging supervised parenting time for Mother in case he had a "meltdown." And though E.K. had not endangered anyone in his foster home to such an extent, that was a very different context from Mother's home. His foster brother was a friend and the same age as E.K.—unlike Mother's younger children. Even still, evidence showed E.K. broke his foster parents' stuff "[a] lot," including throwing a tablet against a wall. And he ran away from his foster home late one night.

The trial court's well-supported finding that E.K. posed a danger to himself and others indicates that, for E.K., "necessary . . . shelter" required an enhanced level of support and care. The issue, therefore, is whether DCS presented evidence establishing Mother failed, refused, or was unable to seek "financial or other reasonable means" to provide E.K. with that enhanced level of support and care. I.C. 31-34-1-1(1)(B). DCS did not meet this burden.

All evidence at the fact-finding hearing revealed Mother's strenuous efforts to obtain services and support to help E.K. stay safe. While E.K.

lived with Mother, he worked with a behavioral analyst and a psychiatrist for years, spent time in multiple institutions, and received both post-adoption and wraparound services. Mother consistently sought a residential placement for E.K. but could not find a facility that would accept him. She also added services DCS suggested. And the services DCS arranged while E.K. was in foster care included nothing new to the family, as Mother had previously taken advantage of them. DCS therefore failed to prove Mother failed, refused, or was unable to seek financial or other reasonable means to supply E.K. with the necessary shelter he required.

Overall, a "reasonable view" of the facts must account for Mother's "larger situation." *S.D.*, 2 N.E.3d at 1289. Had she taken E.K. back into her home without necessary support, she would have put at risk not only E.K.'s safety but also her own and that of her other children. This was not a reasonable option for Mother. CHINS 1 simply does not apply when, as here, a parent who lacks adequate financial resources pursues all available means to maintain the safety of a child who endangers themselves and others. *Cf. In re Lange*, No. 166509, 2025 WL 1108082, at *6 (Mich. Apr. 14, 2025) (concluding that a parent who decided against taking in their child when he would pose "a danger to himself and others if taken home" and given only outpatient treatment did "precisely what an ordinarily and reasonably prudent person would do" in the circumstances). Accordingly, the trial court erred by entering a CHINS 1 adjudication.

For clarity, we note that our reversal of E.K.'s adjudication also affects Father. The trial court initially adjudicated E.K. under CHINS 1 when Father admitted DCS's allegations, but that was an error. DCS's petition alleged E.K. was a CHINS 1 because neither parent picked him up. And Mother denied CHINS 1 applied, which triggered a fact-finding hearing at which she was entitled to contest those allegations. *K.D.*, 962 N.E.2d at 1259. Therefore, the court should not have adjudicated E.K. a CHINS until DCS had proven its allegations regarding Mother. *Id.* Because a CHINS judgment is not rendered "as to Father" or "as to Mother," but as to the child, *id.* at 1256, E.K.'s CHINS 1 adjudication must be vacated in full. And we remind DCS of its duty to expunge its substantiated report from the CPI. *See* I.C. § 31-33-26-15(a)(1).

## B. The trial court erred in deferring to DCS when considering whether to adjudicate E.K. under CHINS 6 or 10.

Mother also asserts the trial court misinterpreted the law by observing a supposed "duty to defer to DCS's judgment" when considering whether to adjudicate E.K. under CHINS 6 or 10. DCS counters that the court properly rejected Mother's attempt "to circumvent the substantiation" under CHINS 1 "that led to the loss of her employment" and that the court properly refrained from inserting "its own opinions" into the case. We again agree with Mother and rely on our roadmap's third guidepost: a trial court's duty to consider CHINS categories not pled by DCS but proposed by other parties when doing so advances the child's best interests and does not prejudice the child's rights.

Though, for reasons explained below in Section III, we decline to hold the trial court erred in not entering a CHINS 6 or 10 adjudication, we conclude the court misinterpreted the law by deferring to DCS's decision to allege only CHINS 1 and by failing to independently assess E.K.'s best interests as required by statute. Moreover, DCS's decision rested on the misconception that a CHINS 6 adjudication could lead to E.K. being placed on the CPI.

According to its order, the trial court believed it lacked authority to enter a CHINS 6 or 10 adjudication because "[s]omeone high up in DCS" had decided cases like this one should be filed under CHINS 1 and it might "violate the principle of power separation and an abhorrence for judicial activism" to overrule that decision. We have no doubt this concern was well-intentioned: courts cannot assume the executive power to dictate the contents of initially filed CHINS petitions. *See* Ind. Const. art. 3, § 1. But as explained above, the critical consideration for a court in any CHINS proceeding is not deference to DCS's filing decision but advancement of the child's best interests. By statute, the Legislature requires the court to independently safeguard those interests—not simply to call DCS's "balls and strikes." I.C. § 31-10-2-2(2). And our trial rules require the court to consider whether amending a CHINS petition would advance "the

presentation of the merits of the action," T.R. 15(B), which must focus on the child's best interests. The court therefore erred in deferring to DCS.

Additionally, DCS's position was based on a misconception. DCS informed the trial court that adjudicating E.K. under CHINS 6 would make him a child-neglect "perpetrator" subject to placement on the CPI, thus limiting his future employability. DCS has since conceded its error. Indeed, a CHINS 6 case falls outside the set of "child abuse and neglect" substantiations that DCS records on the CPI. I.C. §§ 31-9-2-14(a)(1), 31-33-26-2. It would have been more apt for the trial court to consider how the collateral consequences of a CHINS 1 adjudication for Mother—the loss of her special needs education job—would affect E.K.'s best interests.

For these reasons, the trial court failed in its duty to exercise independent judgment when considering Mother's request to amend DCS's petition to include allegations of CHINS 6 and 10. But this does not necessarily mean the court should have entered adjudications under those categories. The question of the appropriate remedy remains.

## III. Due to procedural shortcomings below, the appropriate remedy is to remand for further CHINS proceedings.

In Mother's initial appellate brief, she asked for this case to be remanded to the trial court with instructions to adjudicate E.K. under CHINS 6 and 10. Though DCS concedes such a result would cause it no prejudice, it asserts E.K. cannot be adjudicated under CHINS 6 without receiving an opportunity to admit or deny the applicability of that category—a point Mother agreed with at oral argument. DCS further maintains E.K. cannot be adjudicated under CHINS 10 without further procedural protections. Based on these well-founded concerns, we conclude the correct remedy is remand without instructions to enter adjudications under CHINS 6 or 10.

Our roadmap's second guidepost highlights a child's procedural rights to notice and participation in CHINS proceedings. Section 31-34-10-7 entitles E.K., as the respondent, to admit or deny that the CHINS 6

category applies to him. We thus agree with Mother and DCS that it would be improper to order a CHINS 6 adjudication before E.K. receives notice of the allegation and an opportunity to respond, and before the trial court reconsiders whether to appoint counsel.

Our reluctance to instruct the trial court to enter adjudications under either CHINS 6 or 10 also stems from our concern that the record reflects three violations of E.K.'s procedural rights. The CCS does not reflect that the clerk ever issued a summons for E.K., as the trial court ordered. *See* I.C. § 31-34-10-2(b)(1). The record also does not show the "good cause" for which the court excluded E.K. from the initial hearing. *See* I.C. § 31-32-6-8(2); *cf. B.N. v. Health and Hosp. Corp.*, 199 N.E.3d 360, 364 (Ind. 2022) (citing cases and examples in recognizing that a showing of good cause requires "particularized and specific factual support"). And there is no evidence that E.K. either waived his right to participate in the fact-finding hearing or that the trial court excluded him for "good cause." *See* I.C. §§ 31-32-5-1, 31-32-6-8(2). Simply put, this record reflects serious procedural shortcomings that implicate E.K.'s rights to notice and to be heard.

For these reasons, we refrain from instructing the trial court on remand to immediately enter adjudications under CHINS 6 or 10. But the trial court should hold a hearing and must ensure that it affords E.K. his procedural rights, including reconsidering appointing counsel for him if proceedings continue.

# Conclusion

For the reasons explained above, we vacate the trial court's judgment adjudicating E.K. a CHINS and remand for further proceedings consistent with this opinion.[6]

Massa, Slaughter, Goff, and Molter, JJ., concur.

---

[6] We thank amici—Child Advocates, Inc., Grant M. Kirsh, and the Indiana Public Defender Council—for their helpful briefs.

ATTORNEY FOR APPELLANT J.S.

Elizabeth A. Deckard
Bloom Gates Shipman & Whiteleather LLP
Columbia City, Indiana

ATTORNEYS FOR APPELLEE INDIANA DEPARTMENT OF CHILD
SERVICES

Theodore E. Rokita
Attorney General of Indiana

Benjamin M.L. Jones
Section Chief, Civil Appeals

David E. Corey
Supervising Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE CHILD ADVOCATES, INC.

Rachel Vilensky
Child Advocates, Inc.
Indianapolis, Indiana

Maggie L. Smith
Frost Brown Todd LLP
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE INDIANA PUBLIC DEFENDER
COUNCIL

Bernice Corley
Julia A. Stevens
Indiana Public Defender Council
Indianapolis, Indiana

Joel C. Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEY FOR AMICUS CURIAE GRANT M. KIRSH

Grant M. Kirsh
Kirsh & Kirsh, P.C.
Indianapolis, Indiana